IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
SOUTHERN DIVISION

- - - - - - - - - - - - - - - - x
                       :
UNITED STATES OF AMERICA    :
                       :  Criminal No. PJM-10-0637
    v.               :
                       :
DELABRER, et al,        :
                       :
        Defendants.    :  November 16, 2010
                       :
- - - - - - - - - - - - - - - - x  Greenbelt, Maryland

**REQUESTED PORTIONS OF DETENTION HEARINGS FOR RAVINDER KAUR MELHI AND AMRIK SINGH MELHI, DEFENDANTS**

BEFORE MAGISTRATE JUDGE CHARLES B. DAY

APPEARANCES:

For the Government:          JAMES A. CROWELL, IV, Esq.
                           A. DAVID COPPERTHITE, Esq.
                           Office of the U.S. Attorney
                           6500 Cherrywood Lane
                           Suite 400
                           Greenbelt, MD 20770

For the Defendant
Ravinder Kaur Melhi:        GABRIEL JOSHUA CHRISTIAN, Esq.
                           Law Office of Gabriel J.
                           Christian
                           3060 Mitchellville Road
                           Suite 216
                           Bowie, MD 20715

For the Defendant
Amrik Singh Melhi:           EDWARD JAMES LEYDEN, Esq.
                           Hollrah Leyden, LLC
                           1850 K Street, N.W.
                           Suite 390
                           Washington, DC 20006

Proceeding recorded by electronic sound recording,
transcript produced by transcription service.

```
Audio Operator:              Camille Hatcher

Transcription Company:       CompuScribe
                             5100 Forbes Blvd.
                             Suite 102
                             Lanham, MD 20706
```

# I N D E X

Page

Argument for Detention for Ravinder Kaur Melhi

by James A. Crowell, Esquire
    Attorney for the Government                          5

by Gabriel J. Christian, Esquire
    Attorney for the Defendant                          15

Rebuttal - James A. Crowell, Esquire                    24

Ruling - Magistrate Judge Charles B. Day               26


Argument for Detention for Amrik Singh Melhi

by A. David Copperthite, Esquire
    Attorney for the Government                          32

by Edward J. Leyden, Esquire
    Attorney for the Defendant                          43

Ruling - Magistrate Judge Charles B. Day               57

KEYNOTE: "---" Indicates inaudible in transcript.

1                    **P R O C E E D I N G S**

2            THE COURT:  Good afternoon, please be seated.

3            THE CLERK:  Calling the case of the United States

4    of America versus Ravinder Kaur Melhi in criminal case number

5    PJM-10-cr-637 for a detention hearing.  Counsel, will you

6    please identify yourselves for the record.

7            MR. CROWELL:  Good afternoon, Your Honor, James

8    Crowell and David Copperthite on behalf of the United States.

9            MR. COPPERTHITE:  Good afternoon, Your Honor.

10           THE COURT:  Welcome all.

11           MR. CHRISTIAN:  May it please the Court, Judge Day,

12   Gabriel Christian, counsel for Ms. Melhi who is over here to

13   my left.

14           (Whereupon, the requested portions of the hearings

15   follows.)

16           THE COURT:  Good afternoon, welcome all.  Give me

17   just a moment please.  Any preliminary matters before we

18   begin?

19           MR. CROWELL:  No, Your Honor.

20           THE COURT:  I trust that both sides have a copy of

21   the Pre-trial Services report, is that correct?

22           MR. CROWELL:  Yes, Your Honor.

23           MR. CHRISTIAN:  Yes, Your Honor.

24           THE COURT:  I do not believe there has been a

25   supplement and with that the Government has the burden of

```
 1  going forward, so I will give you first and last opportunity.
 2         MR. CROWELL:  Thank you very much Judge.  At this
 3  time, the Government would move for detention of this
 4  Defendant.  The basis of it first is with respect to the
 5  charge of 1951(a) it is a crime of violence and therefore we
 6  could move under 3142(f)(1) Subparagraph A.
 7         But here having read the Pre-trial Services report,
 8  the Government has most prominently very much concerns of
 9  risk of flight and we would in particular move under
10  3142(f)(2) Subparagraph A.
11         The basis first and foremost is --
12         THE COURT:  I do not like your basis, I do not know
13  what happened.
14         MR. CROWELL:  One moment Judge.
15         MR. CHRISTIAN:  This side of the court has nothing
16  to do with it.
17         THE COURT:  Thank you, I am going to hit that
18  button.
19         MR. CROWELL:  I hope it was nothing I said Your
20  Honor.
21         THE COURT:  Well, it was.  Can we look into that
22  please?
23         MR. CROWELL:  Now turning back to the Government's
24  basis of detention, Your Honor, primarily we would rely on
25  risk of flight.  We join with Pre-trial Services
```

1  recommendation that this Defendant be detained.

2          It is a thorough report, they have had the

3  opportunity to debrief Ms. Melhi and the report reflects not

4  only significant travel to and from India and outside of the

5  United States.

6          The Government would offer the following additional

7  facts as it relates to this Defendant and her role in the

8  charged scheme.

9          First, this case involved voluminous wiretaps and

10  in particular as it relates to this Defendant and her

11  husband, the Government had a wiretap beginning in January of

12  this year through on or about June of this year.

13          There were voluminous intercepts related to this

14  Defendant and her husband and numerous others.  During those

15  intercepted discussions, this Defendant discussed with her

16  husband the movement of millions of dollars of funds into and

17  out of India and into and out of the United States.

18          There were specific discussions of "smurfing"

19  millions of dollars.  That is hiding money on the bodies of

20  others including family members and taking those funds in

21  cash to India.

22          The Government would note that while Pre-trial

23  Services interview reflects that the Defendant admitted to

24  traveling to India in '87, '92, '98 and 2000 but then there

25  is a break between 2000 and 2009 according to the Defendant.

1          The Government has secured this Defendant's U.S.

2     passport, we would note for the record she also possesses a

3     passport from India.

4          In the Government's review of a copy, I have a copy

5     of that and I will be glad to tender it to the Court but I

6     can tell you that I have looked at it and this Defendant has

7     traveled to India in 2002, multiple times in 2004, 2006 and

8     several times in 2008.  She has stamps going into and out of

9     New Delhi and coming back to the United States.

10          So there are significantly many more trips to India

11     as it relates to this Defendant and then back to the United

12     States.  In concomitant with the discussions of moving money

13     to India through wire transfers, financial transactions and

14     then the "smurfing" that is the physically moving money in

15     cash into India.

16          Further, the Government would proffer to the Court

17     rather that there are significant financial assets this

18     Defendant has.  Their home is very large, it is extremely

19     well decorated with very high end items as reported by the

20     FBI who searched that home.

21          In that home the FBI recovered $400,000 in cash in

22     a closet in this Defendant's home.  The Government would also

23     note that in addition to the assets here in the United States

24     including over a dozen liquor stores that the Government

25     would proffer are held in the name of nominee names and third

1   parties that are holding these assets for the benefit of

2   Ms. Melhi and her husband.

3          There was also, the Government has learned, that

4   the Melhi's were building a house and a hospital in India

5   significant millions of dollars of assets over in India as

6   well as those here in the U.S.

7          We also discovered during our review and the FBI

8   and the IRS are reviewing significant financial assets of

9   these Defendants.  There were dozens and dozens of bank

10  accounts with money, millions of dollars, moving in and out

11  and flowing through those bank accounts.

12         The Government would proffer that the proceeds of

13  much of that is illicit and is derived from the charge to

14  conspiracy, the Hobbs Act conspiracy, that is the crime of

15  violence.

16         The Government would further note that these

17  multiple millions of dollars of real estate transactions that

18  this Defendant and her husband are engaged in there is no

19  legitimate source of income that the Government has been able

20  to identify other than the illegitimate Hobbs Act conspiracy

21  as charged.

22         Further, the Government would proffer to the Court

23  that during the course of the wiretap, particularly

24  disturbing is the Defendant's husband discussing with

25  individuals in India and elsewhere the movement of and

1    obtaining of false identification documents, false passports

2    and moving people through Mexico.

3            THE COURT:  Let me slow you down and catch that one

4    more time.

5            MR. CROWELL:  Yes sir.

6            THE COURT:  You said that was her husband speaking?

7            MR. CROWELL:  That is her husband describing on the

8    intercepted phone with other individuals his ability and his

9    admission of previously moving individuals into the United

10   States through Mexico with false documents.  They actually

11   are describing the movement of Indian Nationals into the

12   United States through Mexico with false documents.

13           The Defendant's husband is describing in

14   significant detail his ability to obtain fictitious documents

15   to get people into, so it is not much of a stretch Your Honor

16   for the Government if the Defendant's husband is able to get

17   people into the country, the Government has real concerns

18   about this family's ability to get people out of the country

19   particularly when they have assets abroad.

20           THE COURT:  Let me take you back one other location

21   as well, you spoke about them having more than 12 liquor

22   stores and those stores being held in the names of nominees.

23   Is this something that comes from the wire or is this more

24   suspicion or investigation from the Government?

25           MR. CROWELL:  I can proffer to Your Honor that

1    during the course of intercepts, wiretap intercepts, the

2    Defendant's husband described and had regular conversations

3    with these nominee individuals collecting the money, it is

4    often done in a lease back where they put their assets in the

5    name of a nominee.

6          They create a fictitious lease and then they

7    collect the proceeds from that lease when in fact the actual

8    interest in all of the liquor, all of the proceeds it is all

9    collected and goes to this individual and her husband.

10         It is not a real sale and they hide assets and

11   prove of that, Your Honor, and further I would proffer that

12   during the course of the intercepts we intercepted Mr. Melhi

13   discussing with one of their attorneys how this Defendant and

14   her husband were going to create false documents to create

15   fictitious debts so that they could file bankruptcy.

16         The Melhi's have a $750,000 civil judgment pending

17   against them in Prince George's County Civil Court and they

18   were describing how, the Defendant's husband was describing

19   how they needed to get money off of their books and hide

20   their assets so that it would look like they did not have

21   sufficient funds to pay this outstanding civil judgment.

22         They were actually talking with a member of the bar

23   here in Maryland about how to hide those proceeds and file a

24   fictitious bankruptcy fraud with this Court here in the U.S.

25   District Court in Greenbelt.

1            So it is not only them describing and talking with

2      the nominees it is actually even further that they are

3      actually trying to create fictitious documents with a lawyer

4      to create fake deaths.

5            THE COURT:  And I appreciate the conspiracy angle

6      to all of this, but all of this is language that you have

7      captured with respect to the husband not this Defendant

8      specifically?

9            MR. CROWELL:  No, Your Honor, in fact we have

10     voluminous discussions with this Defendant and her husband

11     describing where to move money, how to move money, when to

12     collect money.  Indeed, Your Honor, I would proffer to the

13     Court that they specifically discussed the laundering of

14     illicit proceeds, in fact, the actual laundering of cash.

15           THE COURT:  I thought that was your opening salvo,

16     I got the information lifted from the wiretap with respect to

17     the smurfing, with the movement of millions of dollars but I

18     thought we were talking specifically about the liquor stores

19     and the nominees.

20           I thought that your representations were while you

21     are certain she is involved in the conspiracy with her

22     husband that the language that comes off of the wiretaps or

23     other source or information with respect to these nominees is

24     that the husband is talking with others and the husband is

25     having these discussions with counsel.

1              MR. CROWELL:  This part is true, Your Honor,

2    however we also intercepted this Defendant talking with her

3    husband about those very things, about describing the hiding

4    of assets, about where to collect money from, who to collect

5    money from, how to move money into various assets, bank

6    accounts which are under the control and often find the

7    exclusive control of this Defendant.

8              Those accounts are not minuscule they number in

9    order of millions of dollars that this Defendant has control

10   of the move and often directing her husband of where assets

11   are going to be and where he can or cannot draw proceeds

12   from.

13             Specifically, Your Honor, I would proffer to the

14   Court that they specifically discuss the laundering of some

15   of the illicit proceeds, the cash that is generated from this

16   Hobbs Act conspiracy and that that is intercepted on the

17   wiretap with this Defendant and her husband.

18             Further Your Honor, equally disturbing is this

19   Defendant discussing with her husband the paying of bribes to

20   public officials here in Prince George's County and in

21   particular they discussed the collection of monies to some of

22   the officials, in particular a police officer, for getting

23   that police officer official assistance here in Prince

24   George's County Government.

25             It is not just to that police officer they discuss

 1   money that they have collectively given to other public

 2   officials for their businesses and getting official

 3   assistance here in Prince George's County.

 4        So there is a lot in the uncharged conduct, Your

 5   Honor, there is quite a lot coming down.  The other thing I

 6   would note for the Court is that if we look back as to how

 7   this Defendant entered the United States it is troubling.

 8        Her husband was convicted in the District Court for

 9   South Carolina for paying, essentially paying, a prostitute

10   $500.00 in order to create a fictitious marriage.  That

11   Defendant, Mr. Melhi, was convicted of that crime, he served

12   several years in prison and the way in which Ms. Melhi

13   obtained U.S. citizenship is through Mr. Melhi.

14        THE COURT:  Let me slow down and catch up to some

15   of that as well.

16        MR. CROWELL:  Yes sir, it is a lot.

17        THE COURT:  I do have Mr. Melhi's information here

18   from Pre-trial Services and you spoke of a conviction out of

19   North Carolina?

20        MR. CROWELL:  South Carolina, Your Honor, there is

21   actually a Fourth Circuit opinion on that case.  I can

22   certainly bring it down to Your Honor.  He served several

23   years in prison related to that, some of that was INS hold

24   time.

25        THE COURT:  I have something with respect to

1    Alabama, but I do not know if you are talking about an

2    additional conviction.

3             MR. CROWELL:  I can probably look for it but I have

4    read a Fourth Circuit opinion related to Mr. Melhi and how he

5    obtained entry into this country.

6             According to the Fourth Circuit opinion that sums

7    all of this up, essentially Mr. Melhi enters the United

8    States through a fraudulent marriage.

9             He apparently admits and it was pursuant to a plea

10   agreement where he pled guilty to paying $500.00 to an

11   individual and through that individual he obtained U.S.

12   citizenship here in the country and then thereafter brought

13   Ms. Melhi into the country through himself.

14            Mr. Melhi after his conviction was ordered removed

15   from the United States, however Mr. Melhi and Ms. Melhi had

16   children by that time and sought compassionate relief to stay

17   here in the United States.

18            The INS Judge ultimately allowed them to stay

19   because they had children now here in the United States and

20   so they were permitted to stay and they have been here ever

21   since and that is how they got here and it kind of goes back

22   to how they got here and what ties they do or do not have

23   here in the United States.

24            This is a factual proffer, Your Honor, I know it is

25   quite a lot but given all of those international travel, the

1  illicit proceeds, moving to and from the United States into

2  India, the voluminous unreported travel to India, the

3  possession of multiple passports both a passport from India

4  and a passport from the United States and certainly I

5  understand from counsel that he is able to secure that

6  passport from India and he is willing to turn that over.

7            In any event, the problem is how she chose to

8  possess it was the main problem in and of itself that there

9  exists this passport from India and that this Defendant fails

10  to report multiple, multiple trips in 2002, 2004, 2006, 2008

11  to India at a time based upon the wiretap.

12            I would proffer to the Court that she is engaged in

13  the laundering of illicit proceeds that number in the

14  millions of dollars from an illicit operation that was run

15  here in Prince George's County.

16            For those reasons we believe she is a significant

17  flight risk and would ask that she be detained pending trial.

18            THE COURT:  Thank you, I will hear from the

19  Defendant.

20            MR. CHRISTIAN:  May it please the Court Judge,

21  Gabriel Christian, counsel for Ms. Melhi.  Let me first off

22  make it clear Ms. Ravinder Melhi is my client, the husband is

23  here and will be before you maybe later this afternoon and I

24  find it a bit troubling that the Government's proffer is that

25  she ought to be punished somehow for a crime that her husband

1    committed before he was married to her.

2         If the gentleman committed a particular crime prior

3    to his marriage to his wife, there is absolutely no reason

4    why this ought to form part of the argument this morning as

5    to why she should be held.

6         I want to make it also very clear that when I heard

7    the Government's position I immediately leaned over to my

8    client because I thought she was going to tell me she came

9    through the Mexico way.  She said she came through the

10   Embassy, had a stamp on the passport and came here as a

11   legitimate immigrant as all of her community did.

12        So I put this before the Court because there are

13   two essential elements that the Court is charged with

14   addressing in such proceedings and that is the safety of the

15   community as in someone who is a perpetrator either known

16   past perpetrator or in planning a perpetrator of violence,

17   someone who can inflict violence in the community.

18        So the community interest has to be served by the

19   bench and we respect that.  As a duly sworn officer of the

20   Court I join the Government in this argument because I

21   certainly would not want to be party to any set of predatory

22   person who would then go out there and inflict harm on our

23   community wounded as it is already.

24        There is another issue that the Court is charged

25   with and that is ensuring that the Defendant appears in court

1    when scheduled to do so.  That the Defendant, therefore, is

2    not possessed of the ability or inclination to be a flight

3    risk.

4            Let me address that issue because I think it is

5    very important or let me address the two issues to go down

6    what it is the Government said.

7            The Government has been on this case for at least

8    two years, so that means the Government has had the entire

9    impedimentary of the Federal Government to investigate the

10   wrongdoing that Ms. Melhi is alleged to have engaged in.

11           But in supporting his argument for that issue of

12   threat to the community or the danger goes to the community,

13   what facts do the Government in fact will allow?  What are

14   the facts that are in fact underlined in making that

15   argument?

16           The Government has been to her house, it is a big

17   house.  The Government has been to her house, it is well

18   decorated.  The Government has found out that they plan to

19   build a hospital in India.  The Government finds out that

20   there are monies that have been moved.

21           Now granted all of those things, none of those

22   things in any way shape or form would seem to form the basis

23   that this is a family that is some mob family that is

24   involved in bumping people off to use a colloquialism or

25   doing any of those things that would pose a danger to the

1   community.

2          So on the issue of violence there is absolutely no

3   conduct that has been illicited that I heard by wire tap, by

4   documentation or witness statements or affidavits that places

5   Ms. Ravinder Melhi in the posture of being a threat to the

6   citizens in the community where she lives, violence therefore

7   does not exist.

8          Based on looking at the Government's evidence

9   illicited thus far in the best possible light, the issue now

10  arises of flight risk.  In a very strange way the Government

11  has made the case I am going to make.

12         They are so vested in the United States, they are

13  U.S. citizens, they have three children.  Repin is autistic,

14  he is 25 and in a way he works in the family business but he

15  is autistic and in that sense he relies on his mother.

16         Anybody who has seen the movie "Rain Man" knows

17  that people who are autistic can be brilliant and actually

18  attend college but they lack the social skills and graces and

19  the side of what you call common sense to operate in a normal

20  and customary fashion.  Repin depends on his mother even

21  though he is 25.

22         Suprid, that is the daughter, she is here today,

23  she is in the Courtroom.  Suprid is at Howard County

24  Community College.  She is living at home as does Repin and

25  is totally dependent on the mother to pay her fees, to cook

1  her food and to do the things that mothers do even if she is

2  over the age of 18.

3       Dilja is 14 years old, a ninth grader.  He was told

4  this morning that they cut the television so that Repin

5  doesn't understand and go ballistic.  What is going on is

6  that Dilja doesn't know and Suprid basically is the only one

7  who has tried to hold things together.

8       You have to understand that because of what I have

9  said, because of what the Government has said I join the

10  Government in forking that imprint or the footprint that they

11  have in the state.

12       There is no cogent reason for her to flee or to

13  have her husband flee would be to basically give up a

14  lifetime of material acquisition and to give up their lives,

15  their dream to abandon their three children who they dearly

16  love.

17       So there is no flight risk.  I have known the

18  Melhi's for 17 years and I have served them in a variety of

19  ways and I can tell you that they are very vested in their

20  community in the sick community in particular.  They are well

21  respected in that community.

22       We know that if azumatic that we are in a stage

23  here where they have been charged with certain offenses on

24  the Federal Code but all systems are systems of laws not of

25  man.

1          They are innocent until proven guilty and I find it

2    passing strange that in a county which has been convulsed

3    over the past 72 hours by the arrest of the Chief Executive

4    who is at home and back at work, whose wife is at home on

5    personal recognizance I take it as, correct me if I am wrong,

6    but they are both home.

7          Now these two business people who have essentially

8    been accused of white collar crime, tax evasion, money

9    laundering, serious offenses I appreciate the seriousness of

10   those offenses but these are not offenses that require the

11   Court to be almost punitive into detaining her almost in an

12   intimidatory fashion to make it difficult for her to continue

13   the business which in an ionic way if it fails it does not

14   help the taxpayer because the argument is the taxpayer has

15   been denied by having liquor come in without the taxes paid,

16   having cigarettes come in without the taxes paid.  The

17   Government is seeking forfeiture.

18         Well if the assets that they have preserved by

19   paying the notes on those assets are forfeited to the banks

20   then the taxpayer has no means to recoup on that which has

21   been lost.  So it in fact helps the Government and helps all

22   of us as citizens to have them go back to do business so to

23   do right, make sure they pay their taxes, keep it running.

24         The Government can monitor all the transactions to

25   make sure that whatever has been paid is being legitimately

1    paid through the banks, monies owed on loans taken,

2    legitimately paid to cigarette dealers for purchases made,

3    legitimately paid to liquor dealers for liquor purchase,

4    taxes paid in a way they ought to be in a normal and

5    customary fashion, phone calls limited to maybe that of

6    counsel and perhaps the religious persons in the community.

7         Travel be limited, she said to me she left the

8    passport which is expired because she is a U.S. citizen in

9    there I take it upon her proffer it is not recognized dual

10   citizenship.

11        So that passport is null and void but even in the

12   Government has a concern she believes the Government may have

13   picked it up during the search.

14        The Government says they don't have it but she is

15   willing to find it and turn it over to give the Court the

16   assurance she intends to go nowhere but to remain here in the

17   State of Maryland until such time the case is called.

18        It is for that reason, Your Honor, I believe that

19   the matter before you is of a kind of a nature that there is

20   no violence there, it has been shown even taking the

21   Government's case it is best.  There is no evidence that she

22   has been involved.

23        There are allusions to her husband being involved

24   in coyote transporting persons across the U.S. Mexican

25   border.  Nobody has said she was involved in that and even if

1    she were she is going to be here in the State of Maryland.

2    She is going to be able to, if the Court finds it so, to

3    refer to the Pre-trial release statement on page 4, "I

4    believe there are conditions of release that could be

5    fashioned to reasonably assure the safety of the community

6    such as Pre-trial Services supervision, third party custody

7    to a suitable third party custodian and location monitoring."

8            I suggest to the Court Ms. Melhi ought to be

9    released on her personal recognizances.  If the Court wants

10   to be careful and cautious I concede that she ought to be

11   also a candidate if personal recognizances is not possible or

12   not to the Court's desire she ought to be monitored

13   electronically so that the Government can be assured they

14   will have someone to be in the dark when the time arises.

15           If I could ask the Court's indulgence for one

16   moment?

17           THE COURT:  Certainly.

18           MR. CHRISTIAN:  I just wanted the Court to

19   understand and I would be happy to talk with the Government

20   in the way of cooperating on that narrow issue.  What she

21   called me aside to say was that she is the accounts

22   receivable payable clerk at the business and they have

23   several businesses and there are deposits that have to be

24   made on a daily basis to cover expenses that have been

25   generated so they don't default.

1          We are willing to work with the Government on that

2     matter or band with because she says that the monies that

3     were being held for deposit Monday are still sitting there

4     they have not been taken.

5          So I say this because in a forfeiture case the

6     assets, one of the arguments the Government typically made is

7     that you don't want to be in a situation where the Government

8     is coming at it but the assets are being subject to waste or

9     disposition.

10         This would be a classic example of waste where the

11    actually engine that drives the enterprises are actually off

12    because it is sitting here at the Greenbelt Courthouse in the

13    lockup downstairs.

14         Let the lady go back to her location under albeit

15    conditions that satisfies the Government's interest which is

16    an interest that I can join if I understand and certainly

17    counsel wants to be reasonable.  The fact that the defense

18    counsel does not mean to throw reason to the winds.

19         We joined in that sense where we want to ensure

20    that the Government has the ability to conduct this

21    investigation and at the same time the rights of all clients

22    are respected and that we don't in fact inflict punishment

23    where there has not yet been an adjudication that shows she

24    is guilty of any particular offense pled thus far.  Thank you

25    very much, Your Honor.

1          THE COURT:  Thank you.  Before I hear finally from

2     the Government I want to review some material, give me a

3     second.

4          (Pause)

5          THE COURT:  Okay, thank you.  I will hear further

6     from the Government.

7          MR. CROWELL:  Thank you Your Honor.  Your Honor

8     just as a procedural matter, the Government would note that

9     in fact the Defendant is charged with a crime of violence

10    1951, it does constitute a crime of violence.

11         The offense here alleges that police officers and

12    others shoveled illicit proceeds here into the State of

13    Maryland and untaxed alcohol and cigarettes that was sold in

14    this Defendant's liquor stores, liquor stores that she owned

15    individually, liquor stores that she owned with her husband.

16         There was a significantly lengthy wiretap which

17    reveals intimate discussions between this Defendant and her

18    husband related to the hiding of the assets from that illicit

19    conspiracy.

20         The discussion of "smurfing" those assets to India,

21    hiding those assets here in the United States and hiding

22    those assets elsewhere.

23         The Defendant in the Pre-trial Services report

24    reflects that she earns $80,000 a year in income.  The

25    Government would proffer to the Court that there are millions

1    of dollars held just in this Defendant's name including CD's,

2    certificates of deposits, for hundreds upon hundreds of

3    thousands of dollars that this Defendant has accounts that

4    are singularly in her name.

5         The Government would proffer that there are third

6    parties that are holding assets for Ms. Melhi and Mr. Melhi

7    and that they regularly go and collect from these other

8    liquor store owners who simply hold the property in trust for

9    Ms. Melhi as well as for her husband.

10        The Government would note that the Defendant only

11   reported certain travel to India including an eight year

12   period that appears that she failed to tell Pre-trial

13   Services about five separate trips to India, that is 2002,

14   2004, 2006 twice and then 2008.

15        Pre-trial Services recommends detention.  We think

16   that that is right.  Here the Defendant is a significant risk

17   of flight in addition to this vast money laundering, in

18   addition to the vast amounts of assets here in the United

19   States including $400,000 in cash recovered from this

20   Defendant's closet yesterday, $400,000 in cash, millions of

21   dollars out there, millions of dollars in unexplained income.

22        But for, what we learned on the wiretap which is

23   this conspiracy to commit a crime of violence that is

24   interstate transport of untaxed cigarettes and alcohol with

25   police officers and others wearing firearms to ensure the

1    safe delivery of those illicit contraband to here in Maryland

2    which is then sold through this Defendant and her husband's

3    liquor stores.

4          There is also the information related to the paying

5    of bribes to public officials in return for official

6    assistance, discussion of that on the wiretap and this

7    Defendant at least possessing an Indian passport whether it

8    is expired or not is immaterial to the fact that there is

9    significant concerns that this Defendant both with familial

10   and financial ties to another country is a significant flight

11   risk.

12         That is what we are standing on here, Your Honor,

13   is this Defendant is simply -- the risk that this Defendant

14   will not show up for trial are too great and the volume of

15   assets that are out there that we are still trying to find

16   are too great and we really do worry that she is not going to

17   be here and we join with Pre-trial Services and ask that she

18   be detained.

19         THE COURT:  Thank you.  Give me a moment.

20         (Pause)

21         THE COURT:  The Government starts out in a place of

22   identifying this offense as a crime of violence as they are

23   correct to do and with that comes a presumption which is

24   rebuttable, of course, by the defense with respect to both

25   risk of flight and dangerousness to the community.

1              As to the danger to the community, I do not think

2     the Government really is arguing here that even though this

3     is a crime a violence that that is where the strength of its

4     argument lies, it is really about risk of flight and I think

5     both counsel have rightly seized upon that issue.

6              I cannot deny that the defense has rightly pointed

7     out that the Defendant has a great interest in this

8     community.  She is vested in the United States.  She has been

9     a long time resident, well maybe not a naturalized citizen

10    of, she has some 25 plus years of residency in this local

11    community.

12             Her children as pointed out are very much a part of

13    all that is going on here.  The Court is required by the Bail

14    Reform Act to look at a number of factors including the

15    nature and circumstances of the offense charged, the weight

16    of the evidence, history and characteristics of the person in

17    the fourth category as to the nature and the seriousness of

18    danger to any person in the community.  All of this is

19    written on the presumption of innocence which the Defendant

20    enjoys.

21             As to the nature of the circumstances of the

22    offense charged, that factor weighs in favor of the

23    Government.  This is a wiretap case and the Government here

24    has proffered to the Court that there are a number of

25    intercepts reflecting the Defendant's voice and conversation

1    and her alleged involvement in millions of dollars being

2    moved.

3            The particular aspect of "smurfing" and there is

4    some inconsistency, if you will, coming from the Pre-trial

5    Services report with respect to her travel to India.  The

6    report clearly states about travel in '87, '92, '98, 2000 and

7    then 2009 whereas the Government has offered that the

8    passport information shows extensive travels, 2002, 2004,

9    2006 twice and 2008.  That is a discrepancy which does not

10   benefit the accused.

11           The Government also speaks about significant assets

12   found in the Defendant's home.  No one should fault the

13   Defendant because she may be wealthy unless that wealth comes

14   from ill gotten games.

15           But the fact that she had $400,000 in cash

16   certainly fuels the Government's argument but there may be a

17   legitimate explanation for that which may very well tie into

18   the Defendant's view that Ms. Melhi and her husband are

19   benefactors of many endeavors in India including a hospital.

20   I do not have enough information to speak to that.

21           The $400,000 however does not bode well on its face

22   but it may very well have a good explanation.  I do not read

23   that much into that aspect of the Government's proffer, not

24   nearly as much as I do the information from the wiretap.

25           But it is all the more troubling when combined with

1   the Government's argument that there are no legitimate

2   sources of income beyond the $80,000 or $90,000 per year that

3   has been offered.

4        Most damning, of course, is the alleged

5   communications about bribing officials in Prince George's

6   County and soliciting police officer help.

7        I have had an opportunity to review the case that

8   was referred to by the Government in its proffer with respect

9   to Mr. Melhi.  It is a decision from the Fourth Circuit Court

10  of Appeals, it is a 1989 decision and it does speak of his

11  being involved in a sham marriage with a prostitute and all

12  kinds of sundry events.

13       But I agree with the defense I cannot lay all of

14  that conduct at the feet of the Defendant here, that is

15  another discussion for another day.  I understand the imports

16  of the Government's argument and why they make it I do not

17  find anything misplaced about it.

18       But in terms of the nature and circumstances of the

19  offense charged that is in favor of the Government.  In terms

20  of the weight of the evidence, that factor weighs in favor of

21  the Government.

22       In terms of the history and characteristics of the

23  person I find several factors that I have enough information

24  on to make a judgment and all of those factors weigh in favor

25  of the accused, namely family ties, length of residence in

1    the community, past conduct, history of drug abuse and/or

2    alcohol abuse.  It is my understanding she does not drink

3    alcohol at all and her criminal history which is none.

4          The other categories I just do not have the

5    information.  But on balance, given the factors that I am

6    charged at looking at it is quite clear that the Government

7    has met its burden in this case with respect to risk of

8    flight and therefore I must order the Defendant detained.

9          Let me ask the Government, the maximum penalty

10   under 1951?

11         MR. CROWELL:  It is 20 years, Your Honor, $250,000

12   fine and three years of supervised release.

13         THE COURT:  Thank you.

14         MR. CHRISTIAN:  Judge, maybe if I may?

15         THE COURT:  Certainly.

16         MR. CHRISTIAN:  A little late in the day for this

17   request but I believe I did in my proffer say to the Court

18   that we certainly would consider very stringent requirements

19   which would involve home detention and monitoring.

20         That way unless she transposes herself into some

21   willows that bridges to the windows she is going to be in

22   that location.

23         I was hoping that the Government would consider

24   this proposal which of course is well within the authority of

25   the Court and certainly within the technical capability of

 1    the Government to do, that is the electronic monitoring and

 2    the home detention and of course the other conditions we

 3    could put having to do with the limitations of one of her

 4    transactions she is to do with the business.

 5          She can conduct it from the house under Government

 6    scrutiny, make sure that everything that has been done is

 7    legitimate.  I did not want to miss the opportunity to

 8    re-emphasize that point.

 9          THE COURT:  I heard when you made it and I thank

10    you for doing so.  I think the facts here as offered by the

11    Government at this point, and I understand that this is not

12    the time for you to necessarily contest every fact, your

13    hands are a little bit tied in that regard, but I do take

14    very seriously and I think the Government takes very

15    seriously the proffers that it makes to this Court to the

16    extent that much of what the Government is saying is coming

17    off of a wiretap.

18          I invite you to return in the event that anything

19    that they have said in a material way is not true.  I have

20    yet to have that occur when the Government is relying upon a

21    wiretap and I do not expect it to occur ever.

22          But they have said some pretty tough things to

23    accept if true but if for some reason you get the discovery

24    and you learn that it is not her voice talking about the

25    "smurfing" or the millions of funds and things being stashed

1    then by all means I would invite you to return because there

2    are a lot of things about Ms. Melhi that may make her a

3    reasonable release candidate.

4              MR. CHRISTIAN:  Your Honor, I was not in any way

5    shape or form taking all I said on face value, taking the

6    Government at its best the issues with regard to being able

7    to show up at trial, her presence in the locale, something

8    that I think the technical abilities of the Government exist

9    to ensure.

10             But I certainly take your point that we can in fact

11   return and we expect to do so shortly.

12             THE COURT:  Okay, thank you.

13             (Whereupon, a recess was taken.)

14             MR. LEYDEN:  Your Honor, we are ready to proceed.

15             THE COURT:  Okay, Mr. Government ready to proceed?

16             MR. COPPERTHITE:  Yes, Your Honor.  Thank you, Your

17   Honor, the Defendant is indicted in a conspiracy to violate

18   the Hobbs Act which the Court knows is a crime of violence

19   and therefore there is a rebuttable presumption regarding the

20   detention of Defendant under 3142.

21             The Defendant first came to our attention in this

22   investigation following the investigation of police officers

23   who were getting paid protection money and basically being

24   paid to protect shipments of contraband.

25             The Defendant Mr. Melhi is a business owner who has

1   many different businesses in Prince George's County and other

2   areas including up in Bel Air and has other, we believe,

3   other assets that are not certainly identified in the Pre-

4   trial Services report.

5           During the course of the investigation, the initial

6   wiretaps were conducted on the police officer and then

7   eventually led to Mr. Melhi.

8           There were extensive wiretaps and conversations

9   captured with Mr. Melhi and other persons detailing a number

10  of violations beyond what he is charged with here and --

11          MR. LEYDEN:  Your Honor just for a moment, my

12  understanding as to the factors that are to be considered go

13  to the nature of circumstances of the offense charged and

14  including whether the offense is a crime of violence or

15  violence of Section 1591 which of course is dealing in

16  children and trafficking for sex of children, a Federal crime

17  of terrorism or a crime involving a minor child.

18          Now I understand the Government has substantial

19  evidence that they may think that is relevant to this but

20  none of that evidence was ever apparently presented to a

21  Grand Jury certainly not one who handed up an indictment on

22  anything other than what is charged in the indictment which

23  for the record is two counts.  One, Section 1951(a)

24  conspiracy which covers a whole multitude of alleged sins and

25  Section 981 which is the seizure statute, the civil seizure

 1  statute, for which the 1951 merely forms a predicate, an SUA,

 2  a specified unlawful act.

 3          Given that, Your Honor, I would ask that we at

 4  least have ground rules as to which factors the Court will

 5  consider in making a determination and do so within the

 6  contours of the applicable statute 3142.

 7          THE COURT:  You may be right in substance but you

 8  are terribly wrong in form.  The Government was here, they

 9  had the floor, they were making their argument and as many

10  times as the case they say some things that are out of

11  bounds.  This may be one of those.  I will gladly take those

12  up at the conclusion of the Government's --

13          MR. LEYDEN:  Very well, Your Honor, my forgiveness

14  for breaching format, I apologize.

15          THE COURT:  That is okay, that is all right.  Go

16  ahead.

17          MR. COPPERTHITE:  Your Honor, just to respond very

18  quickly to that statement the Court can take into

19  consideration many different factors when considering the

20  issue of public safety as well as risk of flight.  They don't

21  have to be charged conduct for the Court to consider that.

22          What I am about to tell you about Mr. Melhi is what

23  I told you already goes to those factors that we are here to

24  consider.  Mr. Leyden has no idea sitting there what was or

25  what was not presented to a Grand Jury.  So for those

1   reasons, Your Honor, let me just continue.

2           The Defendant as the Court is aware has already

3   previously been convicted of using false documents to obtain

4   citizenship, the Court has that opinion from the Fourth

5   Circuit.

6           He came into this country illegally.  During the

7   course of the wiretaps we intercepted conversations with the

8   Defendant with other persons who the Defendant is engaged in

9   trafficking persons into the country through Mexico by way of

10  other countries and smuggling people into the country

11  illegally.

12          I think this shows his knowledge not only of how

13  people can get in and out of the country but his experience

14  himself in terms of his immigration violations that he was

15  convicted of.

16          But that shows his access to persons and to

17  networks.  In particular, there was a network that was

18  identified that the Defendant was bringing people into the

19  country.

20          He also was identified with making false documents

21  and he had a source for false documents that was located in

22  another state and he was getting paid for that process as

23  well.

24          This is why we are conducting wiretaps regarding

25  his conduct relating to the trafficking of the contraband and

1   the police corruption matters that you have before you.

2          In the Pre-trial Services report, it is my proffer

3   to the Court that he greatly undervalues not only his monthly

4   income but also the assets.  Let me give you one example.

5          During the course of the wiretap, Mr. Melhi had

6   originally a $900,000 civil judgment against him and he was

7   attempting to hide assets and to hide properties so that they

8   could not execute that civil judgment and take his assets and

9   property.

10          During the course of the wiretap, he had

11   conversations with persons and conspired with persons to

12   violate the bankruptcy laws and to falsify documents to show

13   that there were liens placed against his properties.

14          THE COURT:  Let me interrupt you momentarily only

15   because I do not want to have an inadvertent breach of

16   attorney/client discussions.  At times it may be necessary

17   for you to speak with your client, I encourage that, but you

18   may want to put your finger on the base of that, no not

19   covered, on that microphone.  Okay, thank you.  I am sorry,

20   go ahead.

21          MR. LEYDEN:  Thank you, Your Honor.

22          MR. COPPERTHITE:  During the course of the wiretaps

23   he was intercepted conspiring with persons including an

24   attorney in Prince George's County to create documents and

25   also persons involved in the construction business to create

1   false liens against his property in order to falsify

2   documents to file with this Court showing that he had debts

3   that exceeded his assets so that they could not execute that

4   civil judgment properly in a way also to negotiate that civil

5   judgment.

6        Ultimately, he was not successful and in his own

7   words he said, I have so many assets I can't hide them all,

8   it won't work.  He greatly undervalues what he has presented

9   here to Pre-trial Services as what he has in assets.  While

10  he was trying to negotiate --

11       THE COURT:  Let me ask, is that because of the

12  logical inference that the Government is making because of

13  the bankruptcy action or is because of something more direct

14  in this instance in terms of your valuation and his

15  undervaluation?

16       MR. COPPERTHITE:  Something more direct and that is

17  what I was just about to say, you just anticipated my next

18  words.  During those conversations regarding the bankruptcy

19  fraud that he was committing and conspiring to commit, he

20  also was making multi-million dollar real estate deals and

21  conducting multi-million dollar real estate deals.

22       It appears that he was engaged with other persons

23  in purchasing commercial properties.  So on the one hand he

24  is telling the Court who held the judgment that he cannot pay

25  it and trying to negotiate his way out of it, on the other

1   hand he is negotiating these multi-million dollar deals and

2   making a lot of investments.  So I think in terms of his risk

3   of flight, he has certainly undervalued his assets.

4          He also was advising different business owners as

5   to how to avoid paying taxes such as the state taxes and the

6   sales taxes at the different locations.

7          It appears from what we know that the most likely

8   scenario is Mr. Melhi will buy businesses, put them in other

9   people's names, in nominees names, sort of lease back those

10  businesses and then take the income out of those businesses.

11         He had several conversations with different persons

12  on how to underestimate your taxes and state your taxes so

13  you don't have to pay as much in sales tax, for example,

14  state those taxes to be much lower.  He directed people who

15  worked for him to do that in certain occasions.

16         THE COURT:  Is there any reason to believe that the

17  information he gave in those discussions was false?

18         MR. COPPERTHITE:  Yes.

19         THE COURT:  Okay, I know that is the import of what

20  you are saying but many people are paid to give advice to

21  others on how to avoid paying taxes.

22         MR. COPPERTHITE:  He was telling them directly, if

23  you say you sold so much this month, say you sold less next

24  month and he was telling them directly as well as people who

25  worked for him at his own businesses to understate the amount

1    of sales so that they wouldn't have to pay as much in sales

2    taxes.

3              As you heard previously, he also had made several

4    statements during the course of these wiretaps to many

5    different people about don't ever put any assets in your own

6    name and I think that is why he feels safe providing this

7    information to Pre-trial Services because he hides assets in

8    other person's names.

9              During the course of this offense he was purchasing

10   tens of thousands and then ultimately hundreds of thousands

11   of dollars worth of contraband, alcohol and cigarettes and

12   the reselling of that alcohol and cigarettes.

13             There is a great profit, it is almost and I would

14   say that it rivals drugs if not and exceed the profit you

15   make in drug sales depending on where you sell this

16   contraband and cigarettes.

17             For example, a pack of cigarettes in New York has a

18   tax of about eight and a half dollars on a single pack.

19             THE COURT:  You mean a carton?

20             MR. COPPERTHITE:  In New York.

21             THE COURT:  You mean a carton?

22             MR. COPPERTHITE:  No, a pack, a single pack.

23             THE COURT:  A pack?  Eight dollars?

24             MR. COPPERTHITE:  That is what I understand.

25             THE COURT:  How much does a pack of cigarettes

1    cost?

2          MR. COPPERTHITE:  A pack of cigarettes is very

3    expensive in New York, $12.00, $13.00 I don't know, I don't

4    smoke I don't know but I do know that that is what I am told

5    taxes in New York are.  In Maryland, taxes avoiding on each

6    single pack was over a dollar and we are talking about master

7    cartons which are cases and cases of cigarettes.

8          Some of the cigarette purchases were 60, 80,

9    100,000, 90,000 dollars worth of cases of cigarettes, so

10   large the amount of the cigarettes they had to actually rent

11   vans where our surveillance people followed vans that were

12   traveling up from Virginia into Maryland right directly to

13   his stores and then the liquor was the same, untaxed liquor

14   the profit margin would be much greater on untaxed liquor

15   than liquor that has state taxes paid.

16         So during the course of this to ensure his ongoing

17   illegal activities he hired Richard Delabrer a Police Sargent

18   for Prince George's County, he is a co-Defendant, to provide

19   protection along with his co-Defendant Amir Milijovik to

20   provide protection of these shipments and paid those persons

21   strictly for the protection to, first of all primarily more

22   to protect the protection by police of this ongoing illegal

23   operation and then also to protect the proceeds that were

24   being paid because the persons that they were paying those

25   proceeds to had a great risk of also being robbed by other

1    competitors.

2            During the course of the wiretap, several

3    conversations were intercepted where it appears that

4    Mr. Melhi is also in the business of loaning money to people

5    and on one particular occasion he threatened that person

6    because that person had not paid the money.

7            On a couple of occasions that I can remember

8    distinctly, he had Richard Delabrer go to see those persons

9    who owed him money.  I cannot tell you anything more about

10   that except his conversation was he told Delabrer to go see

11   this person because they owed Mr. Melhi money and I believe

12   that happened on at least two occasions.

13           There was one time I know where Richard Delabrer

14   offered to go, do you want me to go collect that was sort of

15   the conversation.  Mr. Melhi said, no I will talk to him.

16           But there were other conversations, one in

17   particular where he actually threatened the person because

18   they owed him money.

19           What this shows and what we found are many

20   different businesses that Mr. Melhi is engaged in.  All, as I

21   said, in different nominee names.  He has traveled to and

22   from India, I don't have his passport here to tell you the

23   years, but I am told that when Pre-trial Services interviewed

24   him about his wife's travel he also underestimated his wife's

25   traveling.

1              As we indicated earlier today, she told Pre-trial

2      Services she traveled in the late 80's and 90's and then 2000

3      and then not until 2009 back and forth to India when her

4      passport showed that she traveled in 2002, 2004, two trips in

5      2006 and again in 2008.  He does not mention that either

6      according to --

7              THE COURT:  He might have gotten that right.  He

8      says every two or three years on average, 2, 4, 6, 8.

9              MR. COPPERTHITE:  If that is correct, that is not

10     the conversation I had with the Pre-trial Services officer

11     from this morning.

12             THE COURT:  Well, maybe I am misreading maybe he is

13     reporting his own travel.

14             MR. COPPERTHITE:  I think that is his own travel,

15     Your Honor.  I know he travels to India every so often.

16     During the course of the wire, we intercepted him having

17     conversations about his possible travesty.

18              This is a presumption case as the Court is aware,

19     he is hiring police officers because he is armed and using

20     his office for not only the physical protection of a firearm

21     but also the protection of a badge to interfere with any

22     arrests, any police activity and so forth.

23              Richard Delabrer was intercepted telling persons

24     that if police come I will take care of that, I will talk to

25     them.  We heard conversations where he had indicated during

1   shipping these items out of Maryland that other persons,

2   watch out for this vehicle that is a police vehicle.  Other

3   persons were alerted to the presence of police in the area by

4   Delabrer.

5           So I think that based on all of the facts and

6   circumstances here and the Pre-trial Services report I

7   believe the Defendant is in fact a risk of flight and I think

8   that all of the facts also show that he is a danger to the

9   community and therefore I would ask that he be detained.

10          THE COURT:  Thank you.  I will hear from defense.

11          MR. LEYDEN:  Thank you Your Honor.  As I mentioned

12  at the outset, Your Honor, we are operating here within

13  confines of a very specific statute that Congress enacted,

14  The Bail Reform Act, and did so for very specific purposes.

15          Within the confines of that statute we point to

16  Section 3142(g) which spell forth the factors the Court may

17  consider in reaching its conclusion.

18          Before we get to that, maybe it is probably a good

19  time to ask what is the conclusion that the Court must seek?

20  It must seek two things that are important.

21          One, by the way of the term flight of risk has been

22  used many times and I hear banded about, the fact of the

23  matter is the statute does not use that term.  The statute

24  looks to the assurance that the individual in custody will

25  appear at the time and place of trial.

1        We talk about flight risk, we talk about all these

2   sort of nefarious things, the statute does not use it because

3   it is not looking at these nefarious things, it is looking at

4   can the Court put in place a condition or a combination of

5   conditions that assure that the individual will be at trial

6   when the date is set for him to or she to be tried?

7        The other factor, of course, the safety to the

8   community.  Now the reality of it is that in the type of

9   proceeding we find ourselves in here today, one as specified

10  under Subsection F of 3142, the Government bears the burden

11  or proving both of those factors.

12       One, that there is no condition or combination of

13  conditions that if put in place would assure Mr. Melhi's

14  presence at trial and by a clear and convincing standard that

15  Mr. Melhi presents a danger to the community and elsewhere.

16       Now, as background we have a man who has built his

17  life in this community.  We hear that he runs a store, yes he

18  runs an enterprise here in Maryland a legal register and

19  perhaps it is even a profitable enterprise.  The last time I

20  checked, Your Honor, that is not a crime.

21       In fact, it is something that we aspire to.  We

22  especially aspire to it in people who as Mr. Melhi did came

23  to this country and through the virtue of very hard work and

24  yes support from his family and yes support from his extended

25  community many members of whom are in our gallery here today

1  including the priest from the Temple, the Sikh Temple to

2  which Mr. Melhi belongs and the community that now has drawn

3  close to support him.

4       He has built that kind of a life, the kind of life

5  we all aspire to, in short the American dream.  So with that

6  background let's examine what counsel for the Government has

7  brought forth.

8       Counsel for the Government tells us that Mr. Melhi

9  is a flight risk because he makes a lot of money.  Counsel

10 for the Government tells us that Mr. Melhi is a flight risk

11 as they would have it which again is not the standard under

12 the statute or putting it another way, they tell us that he

13 will not be here for trial because he engaged in discussions

14 that they overheard which they have not shared with us which

15 they are telling us, and at this stage they are entitled to

16 do that take our word for it on a wiretap, that he discussed

17 tax issues.

18      Well I will just point out for the Court I have

19 just finished my term as Chair of the American Bar

20 Association Section of Tax Committee on Employment Taxes.  I

21 served that role for four years.

22      I would wager that I have talked to many people

23 about ways to minimize their tax and I guess under the

24 standards that the Government would impose today, I present a

25 flight risk because that is the standard that is what they

1    are asking the Court to go forward with.

2           They also point to the fact that Mr. Melhi had a

3    conviction 20 years ago, I am sorry, 25 years ago.  It was 25

4    years ago not involving a crime of violence and involving a

5    matter for which he has paid the price.

6           Now what do we use to analyze this?  We use (g),

7    Subsection (g) under 3142, what does that provide?  It

8    provides that the factors that a judicial officer, that is

9    you Your Honor, in determining whether there are conditions

10   of release that will reasonably assure the appearance of the

11   person as required and the safety of other persons in the

12   community must take into account the following information.

13          One, the nature and circumstances of the offense

14   charged including whether the offense is a crime of violence,

15   a violation of Section 1591 as you mentioned which is child

16   trafficking for the purposes of sex, a Federal crime of

17   terrorism or involves a minor victim.

18          That is not what is charged here Your Honor.  We

19   have one indictment, two counts, one is as I mentioned Count

20   2 is under Section 981 is civil forfeiture which is dependent

21   upon Count 1 which traces under 1951(a) which is the catch

22   all conspiracy count.

23          None of these were mentioned in any of the

24   allusions to crime that the Government mentioned here.  None

25   of them even if taken into account have a bearing on whether

1    Mr. Melhi will appear at trial if conditions are fashioned

2    that can ensure that he can do so and let's bear in mind the

3    test is not whether conditions can be fashioned, the test is

4    whether no conditions can be fashioned.

5         We would submit, Your Honor, that under that first

6    prong the Government has failed its test.  The second is the

7    weight of the evidence against him.  Well, we have heard the

8    Government's proffer, how much of that bears on the count

9    charged and how much does not is an open question.

10        I will tell you this, the portion that does not

11   bear directly on the counts charged is irrelevant to this

12   determination statutorily so and we would say under that

13   while no one doubts the hard work the Government engaged in

14   in putting together its investigation they have not put forth

15   today the weight of evidence sufficient for the very specific

16   and specified purpose of satisfying (g)(2) of 3142.

17        Three, the history and character of the person.

18   Well, it is an open question.  The counsel for the Government

19   paints a pretty nasty picture of Mr. Melhi.  I can paint a

20   much prettier one and I would submit Your Honor a much more

21   accurate one.

22        Mr. Melhi has built his life as I alluded to in

23   this community and this community will assure based on its

24   close knit nature, based on its framework of mutually

25   supporting family structures and relationships that Mr. Melhi

 1   will be here.

 2          The Government may not like Mr. Melhi at this

 3   point.  The Government may say nasty things about him but at

 4   the end of the day if they want to win their case they have

 5   to prove that and those elements beyond a reasonable doubt.

 6   That is not what they have to do today in terms of this.

 7          What they have to do in terms of here today is

 8   overcome their burden that as I say again there is nothing

 9   that you have at your vast disposal that would if crafted

10   together assure that Mr. Melhi appears here at trial.

11          The fourth factor is the danger to any person or

12   community that we pose by the person's relationship.  Other

13   than statements recited from a wiretap that are taken from, I

14   would submit, volumes and volumes and volumes of the tape

15   that I expect at some point all of us will probably be

16   listening to, they take snippets of it and they put the worst

17   possible characterization on it.

18          I would submit, Your Honor, that other than that

19   there is not a shred of evidence that the Government has

20   proposed to submit that Mr. Melhi is a danger to anyone in

21   this community.

22          What is more, not far from providing a shred the

23   standard that they have to meet is not the lower

24   preponderance, it is not the reasonable basis that we would

25   see otherwise in a proceeding as to whether to go forward.

1   It is by clear and convincing.

2          It is that 75 percent, 80 percent it is not the

3   snippets of a conversation from volumes of other

4   conversations from volumes of other evidence that ultimately

5   will have to be orally enhanced, that will have to be

6   transcribed, that will have to be put into context because

7   after all many of the individuals in question are not Native

8   Americans, their language is not American English and

9   sometimes words can be misinterpreted.

10          That ultimately will be the test and the Government

11   will ultimately have to match it if they are to prove beyond

12   a reasonable doubt each element of the crime that they have

13   alleged here.  We don't have to get there today.

14          All we have to get today is they have not gotten

15   that very, very high burden of clear and convincing.

16          Now, I have mentioned several times that there are

17   remedies that the Court has available to it and hopefully

18   Congress has set forth those remedies.  They are contained in

19   3142c(b) and they are subject to the least restrictive

20   further conditions or combination of conditions that the

21   judicial officer can determine will reasonably assure the

22   appearance of the person.

23          THE COURT:  I think I must have missed your

24   citation there Counselor.

25          MR. LEYDEN:  I am sorry, Your Honor, 3142c(b).

1          THE COURT:  C (1)(b).

2          MR. LEYDEN:  C (1)(b), I am sorry Your Honor.

3          THE COURT:  That is okay.  I am with you, go ahead.

4          MR. LEYDEN:  Thank you Your Honor I appreciate

5    that.  We go forward with a whole litany of things that Your

6    Honor could do.  For example, they require that the

7    individual maintain employment.  They require that they

8    maintain an educational program.  They require perhaps bail.

9    They require perhaps putting up of property.

10         We also know that available to the Federal

11   Judiciary are two other things.  One, the Government has

12   already alluded to and counsel for the Government mentioned I

13   don't have his passport but someone in the Government does.

14   Mr. Melhi does not have his passport.  What does that mean?

15         Here is what it means, Your Honor, there are as I

16   gage it three ways to leave the United States which is what

17   they are saying.  They are saying, well Mr. Melhi is going to

18   go somewhere to India, Ireland, who knows.  He is going to go

19   somewhere and on the day for trial he will not be here.  That

20   means he has to leave the country.  How does he do that?

21         Well, he can go on an airplane or perhaps he can go

22   to the land borders Canada or Mexico or maybe he even gets on

23   a ship.  Well, all of us who have flown lately and I think

24   that probably includes all of us, knows you cannot get onto

25   an airplane without a passport.  You cannot get into the

1    airport without a passport.

2          The same holds true for crossing over either of our

3    two contiguous borders, into Mexico or into Canada.  It is

4    fairly recent but I can tell you from personal experience you

5    cannot get into Canada without a passport and the same holds

6    true for Mexico.

7          I can tell as a matter of fact, in Canada just as a

8    matter of anecdotal evidence a former Commissioner of the IRS

9    at the last meeting of the American Bar Association Section

10   of Taxes was detained by Canadian customs because their

11   concern was that he was going to be telling Canadians how to

12   avoid U.S. tax.

13         THE COURT:  How do all these people leave the U.S.

14   and get deported and come right back in?

15         MR. LEYDEN:  I am not sure I understand that.

16         THE COURT:  Never mind.  I get your point, go

17   ahead.

18         MR. LEYDEN:  The same holds true for a cruise ship.

19   So let's suppose even that we get to the point of a passport,

20   even without a passport what does that presume?  That

21   presumes that Mr. Melhi is able to get there, he walks there.

22   Well, that gets to our second avenue, our second condition a

23   wrist bracelet or an ankle bracelet, very, very, very

24   effective.

25         I can tell you from personal experience, not

1   wearing one but representing people who have, that if someone

2   cannot go under their deck without getting a call from Pre-

3   trial Services as to what you are doing and God forbid they

4   should go out in the garden because that may bring a U.S.

5   Marshal to their house and rightly so because that is the

6   deal you make.

7           So having said that, what is the opportunity to

8   Mr. Melhi were you to place him under the supervision of the

9   Court, under constant supervision from Pre-trial Services and

10  placed upon his leg one of these devices that are

11  extraordinarily efficient and very, very, very secure that he

12  wouldn't even be able to leave his house.

13          I would submit Your Honor absolutely nil or as

14  close to it as it could possibly be in this universe.  So it

15  leads to our final point.  What happens to Mr. Melhi if you

16  do not find these circumstances to exist which we believe

17  Your Honor that they do and they do manifestly so.

18          Well, he has a family at home.  He has three

19  children, the oldest of whom is a 20 year old.  He suffers

20  from autism, he takes medication for it and without making,

21  and I hesitate to go down the road to proffer in medical

22  evidence in which I am not an expert and probably no one in

23  this court really is without a medical degree or a degree in

24  psychology, but we know from our personal experience one of

25  the things that makes autistic agitated and puts them into a

1    very bad state is instability and the absence of the people

2    in their life who they are used to seeing.

3           In this case that is Mr. Melhi.  So as a very real

4    and practical intermediate result of the Court keeping

5    Mr. Melhi from being in the community under the very severe

6    restrictions that we suggest, this young man, this child and

7    I call him a child even though he is 20 years old because he

8    does suffer from a serious malady, will suffer some very

9    severe disruption.

10          What is the balance to that?  There is no balance.

11   This person will have suffered hardship will be inflicted on

12   a man whom as we speak we must as a matter of our

13   Constitution presume to be innocent and certainly if

14   Mr. Melhi is not presumed to be innocent then none of us are

15   presumed to be innocent because that is the guarantee that we

16   are to live with.

17          So I ask you Your Honor to put in place those

18   things that you have at your disposal that would secure and

19   ensure that Mr. Melhi be available to be here, be in front of

20   you on the day of trial ready to face his accusers and

21   partake in that system, it is the Sixth Amendment the

22   Constitution guarantees us of a trial by a jury of our peers.

23   I thank you Your Honor.

24          THE COURT:  Thank you.

25          MR. COPPERTHITE:  Just a couple brief things.  I

1    forgot to mention Your Honor, just for the record, $400,000

2    in cash was recovered from his house as the Court is aware

3    from the earlier hearing.

4          The other thing I forgot to mention, Your Honor,

5    that was intercepted during these wiretaps was that Mr. Melhi

6    was engaged in bribing public officials in Prince George's

7    County in relation to getting certain official acts done that

8    are related to his business and also his personal interest as

9    well.

10         THE COURT:  Let me ask you to put a little more

11   meat on that to the extent that you are at liberty, I am not

12   asking for names, I am asking what is it that was sought and

13   how did you come to know it, I assume it is by the wire?

14         MR. COPPERTHITE:  This is correct, from the wiretap

15   we intercepted conversations with him and with public

16   officials where he was discussing getting certain acts done

17   and paying this public official for those acts to be done in

18   Prince George's County.

19         THE COURT:  When you paying?

20         MR. COPPERTHITE:  Money to public officials to have

21   acts done, bribes.  As the Court is aware, this is a

22   presumption case although that was a lot of presentation and

23   statements by counsel, I didn't hear anything in there that

24   rebutted presumption that the Defendant is a risk of flight

25   and a danger to the community and I would request the Court

1    detain Mr. Melhi.

2            THE COURT:  Thank you.  Given that there were some

3    new and additional bits of information I will give the

4    defense further opportunity.

5            MR. LEYDEN:  Again, we revisit (g) and (g)(1)

6    specifically, whatever the Government construes to be what it

7    now claims to have heard none of it found its way into the

8    indictment before us today.

9            Hence, none of it is under (g)(1), hence none of it

10   is relevant to this determination no matter how inflammatory

11   or incendiary it may otherwise be and I would go further to

12   say Your Honor that even if it were how does that go to the

13   risk flight?  How does that go to say that it makes it any

14   less likely that Your Honor can put into place conditions

15   that assure that Mr. Melhi be here on the day of trial which

16   after all is the factor to be put in place.

17           So again either as a matter of law or just as a

18   matter of pure simple common sense as nasty and as

19   inflammatory as that may sound it does not get to the heart

20   of the matter.

21           Your Honor, still regardless of what the Government

22   thinks it heard or did hear does not get to the heart, can we

23   protect, can we put in place conditions that assure that

24   Mr. Melhi be here at trial.

25           In terms of this presumption, I disagree as a

1   matter of law, I believe that we are still under (f), the

2   presumption gets us to (f).

3           Now, I am assuming when the Government says we are

4   in a presumption mode that they are referring either to

5   (e)(2) of 3142(e) or (e)(3) and starting from (e)(3) which is

6   subject by rebuttal by the person, of course it shall be

7   presumed at no condition.

8           I go through (a), (b), ©, (d) and (e) and I see

9   (1)(a) talks about crimes under the control of the dangerous

10  substance statute, that does not exist and offense under 924,

11  956 which is the RICO statute or 2332(b) which is the Federal

12  statute the governing terrorism, that does not exist and

13  offense described in 2332(b)(g)(5)(b) of Title 18 that is not

14  charged and offense under Chapter 77 of this Title for which

15  a maximum term of imprisonment or 20 years is described or an

16  offense including a minor victim.

17          Other than (b) none of this implies.  I would also

18  go further to say under (d) they have not met their burden on

19  that either.

20          So even if the burden is upon us we have met it and

21  we would submit Your Honor that the burden before the Court

22  is this series or combination of conditions that can be put

23  in place to assure that Mr. Melhi comes to trial.

24          THE COURT:  Thank you.  Anything further from the

25  Government?

1          MR. COPPERTHITE:  No, Your Honor, thank you.

2          THE COURT:  Thank you.  Give me just a moment

3   please, let me review my notes.

4          (Pause)

5          THE COURT:  Let me hear further from the Government

6   with respect to the argument that counsel made on the crime

7   of violence prong.

8          MR. COPPERTHITE:  Extortion is the crime of

9   violence, Your Honor, it is a Hobbs Act conspiracy.

10         THE COURT:  Correct.

11         MR. COPPERTHITE:  And that is a crime of violence

12  and therefore we are entitled to a presumption.

13         THE COURT:  Thank you.  I have looked at the nature

14  of the circumstances of the events charged, offense charged,

15  and the weight of the evidence both wave in favor of the

16  Government.

17         As to the character of the accused and other

18  historical information regarding the Defendant, virtually all

19  of those aspects flow in favor of the defense with a couple

20  of interesting exceptions.

21         There is a very dated but relevant conviction for

22  conspiracy to violate immigration laws where the Defendant

23  was sentenced to five years and there is also the reference

24  in Melhi versus U.S. Immigration and Naturalization Service

25  from the Fourth Circuit where the Defendant was found guilty

1   in 1985 from the Eastern District of North Carolina where he

2   confessed to his participation in the scheme resulting in his

3   being sent to jail again for five years.

4          I find those to be relevant and interesting to the

5   only real prong that the Government has here of any meaning,

6   that is I do not find the Defendant to be a danger to the

7   community.

8          While the crime charged is a crime of violence and

9   the crime charge does have some very bad overtones to it, I

10   do not find that that condition could not be addressed.

11          The Government has a alluded to wiretap information

12   which includes the Defendant paying for protection by way of

13   police officer, that is a very troubling allegation.  I think

14   the words used by the Government was, hiring a badge, and

15   that very well could be our worst nightmare.

16          But these convictions for using false documents and

17   for trafficking in persons I believe was used by the

18   Government as they said with respect to the risk of flight

19   prong which is another euphemism for the statute of concern

20   about ones appearance at court on the date and time asserted

21   as was correctly pointed out by the defense.

22          These persons being trafficked through Mexico and

23   the notion that the Defendant has access to the resources and

24   the people and the networks those are pretty significant

25   concerns.

1          Equally troubling and of the same vein is the

2  notion that the Defendant through the wire is engaged in

3  efforts to hide his assets and to direct others how to under

4  report, and I agree there are legal instances in which people

5  actually pay good money for good lawyers to go and tell them

6  how to minimize their tax liability, but the clear statement

7  from the Government is that this was not of that level.  This

8  was of the criminal element.

9          The Government spoke about the actual surveillance

10  of vehicles trafficking in these cigarettes to the

11  Defendant's store.  All of these are deeply troubling not to

12  mention the cash obtained from the Defendant's home and the

13  reported actual discussions of bribery with a Prince George's

14  County official on the wiretap as well.

15          There will come a time for the Government to back

16  up its claims.  This is not that time beyond the notion that

17  they have to tell me enough and I have to have sufficient

18  confidence in their representations that it bears the indicia

19  of truth. I find that it does.

20          To the extent that there is a misrepresentation in

21  any of the proffer that can be addressed whenever it is found

22  out.  The defense's concern about the impact upon Mr. Melhi's

23  children is a legitimate one but not one which is controlling

24  in this analysis.

25          It is a factor and when I blend them all together I

1   find that the Government has met its burden with respect to a

2   risk of flight and I must order the Defendant detained until

3   his trial date.

4           Let me ask the Government once again the maximum

5   penalty for the lead count?

6           MR. COPPERTHITE:  Yes, Your Honor, 20 years

7   incarceration, $250,000 fine and up to five years supervised

8   release.

9           THE COURT:  Thank you.  Anything further from the

10  Government?

11          MR. COPPERTHITE:  No, Your Honor, thank you.

12          THE COURT:  Anything further from the defense?

13          MR. LEYDEN:  None at this time.

14          THE COURT:  Thank you all for your time, wish you

15  well.

16          (Whereupon, the requested portion of the hearings

17  were concluded.)

18

19

20

21

22

23

24

25

<u>C E R T I F I C A T E</u>

I certify that the foregoing is a correct

transcript from the duplicated electronic sound recording of

the proceedings in the above-entitled matter.


By:


_____/s/          12-2-10
Michelle L. Smiroldo                           Date
Certified Transcriber
Certificate No.: CET**D-579